UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Bankr. No. 13-10118 |
| | ) | Chapter 11 |
| NORTHERN BEEF PACKERS | ) | |
| LIMITED PARTNERSHIP | ) | |
| Tax ID/EIN 26-2530200 | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| SDIF LIMITED PARTNERSHIP 6 | ) | Adv. No. 13-1016 |
| and SDIF LIMITED PARTNERSHIP 9, | ) | |
| South Dakota Limited Partnerships | ) | |
| | ) | |
| Plaintiffs | ) | |
| -vs- | ) | |
| | ) | |
| NORTHERN BEEF PACKERS | ) | |
| LIMITED PARTNERSHIP; | ) | |
| WHITE OAK GLOBAL ADVISORS, LLC; | ) | |
| OFFICIAL COMMITTEE OF | ) | |
| UNSECURED CREDITORS OF | ) | |
| NORTHERN BEEF PACKERS LIMITED | ) | |
| PARTNERSHIP; | ) | |
| SCOTT OLSON DIGGING, INC.; | ) | AMENDED DECISION RE: |
| EPOCH STAR LIMITED; | ) | CLAIM OF DEFENDANT |
| NORTHWEST PIPE FITTINGS, INC.; | ) | SCOTT OLSON DIGGING, INC. |
| HOUSE OF GLASS, INC.; | ) | |
| CLIMATE MAKERS, INC.; | ) | |
| DIAMOND VOGEL PAINTS; | ) | |
| AXIS CAPITAL, INC.; | ) | |
| BEST BUSINESS PRODUCTS; | ) | |
| CRYOVAC, INC.; | ) | |
| FARNAM STREET FINANCIAL, INC.; | ) | |
| LENOVO FINANCIAL SERVICES; | ) | |
| MARCO; | ) | |
| VAR RESOURCES; | ) | |
| US BANK EQUIPMENT FINANCE; | ) | |
| JARVIS PRODUCTS CORPORATION; | ) | |
| DAEWOO INTERNATIONAL | ) | |
| AMERICA CORP.; | ) | |
| TWIN CITY HIDE, INC.; | ) | |
| WELLS FARGO BANK, NATIONAL | ) | |

ASSOCIATION;                             )
MADGID GLOVE & SAFETY                    )
MFG. CO. LLC;                            )
HARMS OIL;                               )
WESTERN EQUIPMENT FINANCE;               )
A-D SERVICES INC.;                       )
ROCKTENN CP LLC; and                     )
BROWN COUNTY, SOUTH DAKOTA               )
                                         )
                         Defendants.     )

The matter before the Court is the allowance of Defendant Scott Olson Digging, Inc.'s claim. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). The Court enters these findings and conclusions pursuant to Fed.R.Bankr.P. 7052. As discussed below, the Court concludes Defendant Scott Olson Digging, Inc. holds a secured claim for $205,104.07 against the bankruptcy estate of Debtor-Defendant Northern Beef Packers Limited Partnership, plus applicable interest to the petition date. Defendant Scott Olson Digging, Inc. may file a separate application for pre-petition attorney fees under S.D.C.L. § 44-9-42 and post-petition costs, including attorney fees and interest, under 11 U.S.C. § 506(b).

I.

Northern Beef Packers Limited Partnership ("Debtor") filed a chapter 11 petition in bankruptcy. Debtor is not reorganizing. Most of Debtor's assets were sold at auction. Limited funds remain to pay claims.

Two of Debtor's secured creditors, SDIF Limited Partnership 6 and SDIF Limited Partnership 9, initiated this adversary proceeding, asking the Court to determine several claims and sort out the priority of various parties' liens and other

encumbrances against Debtor's assets (doc. 1).  The final major issue to be resolved in the adversary proceeding is the amount of the claim held by Defendant Scott Olson Digging, Inc. ("SOD").[1]

SOD provided various earth-moving related services to Debtor as construction of Debtor's beef processing plant began.  Dennis Hellwig, one of Debtor's founders and organizers, and Scott Olson, the president of SOD, executed four written contracts, one each on October 20, 2006,[2] November 24, 2006,[3] December 28,

---

[1]Defendant RockTenn CP LLC's claim remains unresolved.  Another status conference on it is being scheduled by separate order.

[2]Contract 1 is entitled "AGREEMENT" and was signed by Hellwig and Olson on October 20, 2006.  It states:

This agreement is between Northern Beef Packers, Inc. and Scott Olson Digging, Inc.  Scott Olson Digging, Inc. will perform the following work:

- Load and haul 200,000 cubic yards out of pile approximately 1 ½ miles to site
- Doze to plan grades
- Shape lagoon
- Compaction complete to 92% - 95% (testing done by others)
- Install culverts
- Buy and install gravel on site road
- Install silt fence (supplied by owner)
- Supply and pay for fill at owner's site, 1 ½ mile from site.
- Install signs for traffic control
- Not responsible for damage to roads, but will maintain in and out of site area

* Approximate start date will be November 1, 2006.

Lump Sum Price $900,000.00
Due upon start of project:  $75,000.00
Progress payments will be due every 2 weeks from start date.

[3]Contract 2 is entitled "AGREEMENT" and was signed by Hellwig and Olson on November 24, 2006.  It provides:

This agreement is between Northern Beef Packers, Inc. and Scott Olson Digging, Inc.  Scott Olson Digging, Inc. will perform the following work:

- 31,000 cubic yards of sand:  delivered, stockpiled and moved on building site @ $9.42

2006,[4] and July 13, 2007.[5]  SOD performed additional work, but the scope of and agreed price for the additional work is contested.  SOD began its work at the construction site in early November 2006 and completed its work in late November 2007.  After that time, Warren Barse, who had been employed by SOD during SOD's tenure with Debtor, continued doing material-moving related services for Debtor as the construction project continued.

Though the record is not clear, it appears in the first several months of their

_____

- 23,000 cubic yards of gravel:  delivered, stockpiled and moved on building site @ 13.85 per ton

[4]Contract 3 is entitled "Phase 3 - AGREEMENT" and was signed by Hellwig and Olson on December 28, 2006.  It provides:

This agreement is between Northern Beef Packers, Inc. and Scott Olson Digging, Inc.  Scott Olson Digging, Inc. will perform the following work:

- 165,000 cubic yards - Site 2 Grading at $4.50 per cubic yard, totaling $742,500.00.
- Progress payments to be made every 2 weeks from start date.

[5]Contract 4 is dated June 29, 2007, is entitled "Phase 4 - AGREEMENT," and was signed by Hellwig on July 13, 2007 and Olson on July 16, 2007.  It provides:

This agreement is between Northern Beef Packers, Inc. and Scott Olson Digging, Inc.  Scott Olson Digging, Inc. [is] to perform the following work:

- Sand to job from Jeff Hall pit at $8.00 per ton - 4,500 ton
- South Dakota base course delivered @ $14.90 per ton - 20,000 ton
- 3" minus open graded crushed aggregate SD DOT Spec installed at basement at $28.52 per ton – minimum 10,000 ton
        (follow SD DOT spec 2004 Standard Specifications for Roads and Bridges)
- Basement Excavation approximately 32,591 cubic yards at $3.50 per cubic yard
- Progress payments to be made every 2 weeks from start date.

There is a handwritten note beside the line that references "South Dakota base course."  The note says "Lay in place[.]"  The handwritten note does not appear to be initialed by either party.

relationship, SOD did not produce and Debtor did not require invoices that were tied to a particular written or oral agreement, and Debtor made rounded payments to SOD that did not necessarily match specific sums set forth in particular invoices. Later, Donald B. Ulmer, who served Debtor as a project engineer beginning in June 2007, kept a closer eye on Debtor's payments to SOD. Debtor's payments to SOD totaled $3,109,771.89 by the end of October 2007. The record does not reflect which particular invoices Debtor paid. Debtor has not made any more payments to SOD since October 2007.

Representatives for Debtor and SOD conferred in late 2007 and early 2008, attempting to reconcile accounts. SOD produced several invoices dated around the time of their meetings. An accord was not reached. SOD filed a mechanic's lien on March 27, 2008, and Debtor and an affiliate started a state court action against SOD in 2008. The matter remained unresolved for a handful of years, carrying into Debtor's 2013 chapter 11 bankruptcy case, Bankr. No. 13-10118 (D.S.D.), and this adversary proceeding.

In Debtor's bankruptcy case, SOD filed a proof of claim for $3,311,417.00 (proof of claim 69-1). SOD stated its claim was comprised of $2,114,975.49 principal as of November 29, 2007 and $1,196,441.64 statutory pre-petition interest. SOD further indicated its claim was fully secured by the mechanic's lien on Debtor's real property. In addition to the interest, SOD also stated in its claim that it was entitled, under S.D.C.L. §§ 44-9-40, 44-9-41, and 44-9-2, to other costs, including attorney fees, but said it had not yet determined what those additional costs were.

-5-

As supporting documentation for its proof of claim, SOD attached its Answer and Counterclaim from the state court action.  Attached to the state court pleadings was a Bill of Particulars, and attached to the Bill of Particulars was SOD's Mechanic's Lien Statement and 42 invoices.  The invoices totaled $5,096,228.26.  The Court was unable to find anything in the proof of claim or the several attachments that distinguished paid invoices from unpaid invoices or otherwise itemized SOD's principal claim of $2,114,975.49.  Though no party filed an objection to SOD's proof of claim, challenges to SOD's claim were raised through the adversary proceeding.

Through various motions and defaults in the adversary proceeding, and consistent with SOD's counterclaim and cross-claim (doc. 38), it has been determined SOD's secured claim, once the claim is liquidated, has priority over the mortgages held by Plaintiffs and Defendant White Oak Global Advisors, LLC and over the judgment liens and other encumbrances held by the other defendants, save one:  Defendant Brown County, South Dakota's lien for real estate taxes and special assessments has priority over SOD's mechanic's lien (doc. 200).

 In its cross-claim against SOD, Debtor said SOD is not owed any more for its work and has actually been overpaid "by nearly $100,000.00" (doc. 53).  Debtor asked the Court to disallow SOD's claim and avoid SOD's mechanic's lien to the extent the claim is disallowed.  Citing 28 U.S.C. § 2201, Debtor also asked the Court to disallow SOD's mechanic's lien because SOD filed a "false and exaggerated account in support of its mechanic's lien statement[.]"  Debtor did not ask that SOD be required to return any overpayment.

-6-

In its answer to SOD's cross-claim, Debtor essentially agreed SOD holds a mechanic's lien to the extent SOD has a valid claim and its mechanic's lien has priority over Plaintiffs' and the other defendants' secured claims (doc. 92). Debtor then made numerous, generalized equitable arguments against SOD's claim, and again argued SOD's mechanic's lien should be voided because it was fraudulently claimed.

In its answer to Debtor's cross-claim, SOD reiterated many of its earlier allegations and essentially reminded Debtor that Debtor's counsel, in a letter dated May 18, 2010, had conceded SOD had not been overpaid but instead was actually owed $182,682.00 (doc. 71). As with SOD's proof of claim, the Court was unable to find anything in SOD's various adversary proceeding pleadings or the attachments thereto that itemized SOD's $2,114,975.49 principal claim.

The parties in interest[6] stipulated to several facts before trial (doc. 254):

      1.  In 2005, Dennis Hellwig, who had owned and operated a large livestock auction business in the Aberdeen, South Dakota area, began efforts to build a beef packing plant in Aberdeen, South Dakota (the "Project").

      2.  On or about October 31, 2006, Mr. Olson executed the parties' first contract ("Contract 1") on behalf of SOD, and Mr. Hellwig executed Contract 1 on behalf of the Debtor's predecessor, Northern Beef Packers, Inc. ("NBPI"). Upon execution of Contract 1, Mr. Hellwig wrote SOD a check in the amount of $75,000.00 from his personal account. A true and correct copy of Contract 1 [was] attached [thereto] as Exhibit A.

      3.  After the execution of the Contract 1, the parties entered into the following written contracts:

---

[6]Only Debtor and SOD actually litigated SOD's claim at trial, although Plaintiffs and some other defendants had filed pleadings regarding SOD's claim.

a.  Contract dated November 24, 2006 ("Contract 2"), a true and correct copy of which [was] attached [thereto] as Exhibit B;

b.  Contract dated December 28, 2006 ("Contract 3"), a true and correct copy of which [was] attached [thereto] as Exhibit C; and

c.  Contract dated on or about June 29, 2007 ("Contract 4"), a true and correct copy of which [was] attached [thereto] as Exhibit D.

4.  Between November 1, 2006 and mid-January 2007, when work was halted for the season, SOD performed services and provided materials as contemplated under Contract 1, Contract 2, and Contract 3.

5.  According to the mechanic's lien statement referenced below, the first item of SOD's contribution to the Project was made on November 28, 2006, but the actual first day of work was on or about November 13, 2006.

6.  From November 13, 2006 through October 31, 2007, SOD was paid a total of $3,109,771.89.

7.  SOD's last day of work on the Project was on or about November 29, 2007.

8.  Pursuant to fifteen invoices dated December 10, 2007 and a single invoice dated January 11, 2008, SOD sought payment of a total of $892,702.04.[7]

9.  Attached as Exhibit E [was] a summary of the above-

---

[7]The import of stipulated fact no. 8 is unclear, except perhaps to show what invoices SOD submitted to Debtor after their late 2007 and early 2008 meetings to reconcile accounts.  It is true SOD's fifteen invoices dated December 10, 2007 and a single invoice dated January 11, 2008 total $892,702.04.  However, Debtor has agreed six of the December 10, 2007 invoices and the lone January 11, 2008 invoice are payable.

referenced invoices and payments.[8]

      10.   The invoices described in the attached Exhibit F are accurate statements of work actually performed and the parties agree that SOD was entitled to payment of the invoiced amounts.

      11.   On March 27, 2008, SOD filed a mechanic's lien statement with the Brown County Register of Deeds, asserting a lien and claim in the amount of $2,114,975.49 for work performed and materials provided between November 28, 2006 and November 29, 2007.

      12.   On or about May 9, 2008, the Debtor commenced an action against SOD in the Brown County District Court, styled Northern Beef Packers LP, et al. v. Scott Olson Digging, Inc. and Scott Olson, Case No. 06CIV08000990.  On or about May 22, 2008, SOD served and filed an answer and counterclaim.  The action in the Brown County District Court remained pending as of the commencement of the Debtor's chapter 11 case.

As with SOD's proof of claim and its pleadings in the adversary proceeding, the parties' stipulated facts did not include an itemization of what comprised SOD's principal claim of $2,114,975.49 as of November 29, 2007.  According to Exhibits E and F attached to the stipulated facts, the disputed invoices bear several different dates and total $3,377,848.03, well in excess of SOD's principal claim of $2,114,975.49.[9]  As with SOD's proof of claim and its pleadings in the adversary proceeding, the parties' stipulated facts did not set forth the dates and amounts of the

---

[8]The Court was unable to locate anything in this exhibit that set forth the amounts or dates of Debtor's payments to SOD.  They were included in SOD Exhibit 88, at 2.

[9]Attached to SOD's pre-trial brief was an exhibit that included as one column a "running" total of the disputed invoices (doc. 262).  SOD presented the same document as SOD Exhibit 88, at 1.  Near the bottom of the column, it appears disputed invoice 1234 was not included in the total.  When invoice 1234 is included, the total of the disputed invoices is $3,377,848.03.

payments Debtor made to SOD or link Debtor's payments to particular invoices, either disputed invoices or undisputed invoices.  The total of SOD's 42 invoices, less the total of Debtor's payments to SOD, did not equal the amount of SOD's principal claim. Thus, the record was muddled and cumbrous from the get-go.

A four-day trial to determine the amount of SOD's claim was held.  As noted above, Debtor did not dispute several of SOD's invoices.  What remained for the Court's consideration were the disputed invoices, including an undated invoice that seemingly first appeared at trial for $44,942.39 for reimbursement of some excise taxes.  Post-trial, Debtor acquiesced to the payment of invoice 1227 for $32,653.12, yielding a total of $1,751,033.35 for the undisputed invoices.  The remaining disputed invoices are addressed herein.

## II.

If a creditor executes and files a proof of claim in compliance with the Federal Rules of Bankruptcy Procedure,[10] the claim constitutes "prima facie evidence of the validity and amount of the claim."  Fed.R.Bankr.P. 3001(f).  The claim is deemed allowed pursuant to 11 U.S.C. § 502(a) unless the debtor or other party in interest objects to the claim, through either an objection or an adversary proceeding.

---

[10]A creditor's proof of claim must substantially conform to Official Form 10 and be signed by the creditor or the creditor's authorized agent.  Fed.R.Bankr.P. 3001(a) and (b).  The creditor must attach to the proof of claim certain writings on which the claim or interest in property is based and evidence of the perfection of any security interest.   Fed.R.Bankr.P. 3001(c)(1) and (d).   The claim must be filed timely, Fed.R.Bankr.P. 3003(c)(3) and Bankr. D.S.D. R. 3003-1 (chapter 11 cases), and the filing must comport with a court's particular filing requirements, Fed.Rs.Bankr.P. 3002(b) and 5005(a).

Fed.R.Bankr.P. 3007(a) and (b).  If an objection to the claim is filed or an adversary proceeding related to the claim is commenced, the Court must determine the petition-date amount of the creditor's claim as that claim arises from nonbankruptcy substantive law, subject to any qualifying or contrary provisions of the bankruptcy code.  11 U.S.C. § 502(a) and (b); *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000); *Sears v. Sears* (*In re AFY, Inc*.), 463 B.R. 483, 488 (B.A.P. 8th Cir. 2012). The objector must put forth substantial evidence rebutting the claim or, in other words, the objector must meet, overcome, or at a minimum, equalize the filed claim. *F.D.I.C. v. Union Entities* (*In re Be-Mac Transport Co.*), 83 F.3d 1020, 1025 n.3 (8th Cir. 1996) (citing *In re Gridley*, 149 B.R. 128, 132 (Bankr. D.S.D. 1992)); *Waterman v. Ditto* (*In re Waterman*), 248 B.R. 567, 571 (B.A.P. 8th Cir. 2000) (citing *inter alia Brown v. I.R.S.* (*In re Brown*), 82 F.3d 801, 805 (8th Cir. 1996), *abrogated in part by Raleigh,* 530 U.S. at 19-26[11]).  If the Court finds the objector has rebutted the *prima facie* validity of the claim, then the creditor must go forward and, by a preponderance of the evidence, prove the allowability of its claim.  *Brown,* 82 F.3d at 805; *Kimmons v. Innovative Software Designs, Inc*. (*In re Innovative Software Designs, Inc*.), 253 B.R. 40, 44 (B.A.P. 8th Cir. 2000); *In re Somerset Apts., Ltd.*, No. 8:06CV678, Bankr. No. 04-84197, 2007 WL 552209, at *7 (D. Neb. Feb. 21, 2007).[12]

---

[11]Claims for taxes by a governmental entity may be subject to a different allocation of burdens.  *Raleigh v. Ill. Dept. of Revenue*, 530 U.S. 15 (2000).

[12]The parties presented several witnesses out of order, which made challenging the Court's task of determining each party's success in meeting its evidentiary burden.

The parties do not dispute SOD's claim arises from South Dakota law.  In South Dakota, a contract, oral or written, is formed when the four essential elements exist: (1) the parties are capable of contracting; (2) they consent to the subject of the contract; (3) the object of the contract is lawful; and (4) there is sufficient cause or consideration.   S.D.C.L. § 53-1-2.   Mutual promises constitute sufficient consideration. *Scotland Vet Supply v. ABA Recovery Service, Inc.*, 583 N.W.2d 834, 837 (S.D. 1998).   Though an oral agreement may stand on its own, only an executed–fully performed–oral agreement or a written agreement may modify a written agreement.   S.D.C.L. § 53-8-7; *Mettel v. Gales*, 82 N.W. 181, 183 (S.D. 1900).

If a contract does not specify the amount of consideration or how it is to be determined, "the consideration must be so much money as the object of the contract is reasonably worth."  S.D.C.L. § 53-6-11.

> It is a settled rule of law that where services are rendered by one for another which are knowingly and voluntarily accepted, without more, the law presumes that such services were given and rendered in the expectation of being paid and will imply a promise to pay what they are reasonably worth.

*Schmidt v. Clark County*, 271 N.W. 667, 669 (S.D. 1937) (citing 28 R.C.L. 668).

Once a contract has formed, whether written or oral, the Court's job, when interpreting it, is to give effect to the parties' mutual intent by considering the entire contract. *Mueller v. Cedar Shore Resort, Inc*., 643 N.W.2d 56, 70 (S.D. 2002); *Chord v. Pacer Corp*., 326 N.W.2d 224, 225-26 (S.D. 1982).   Only if a contract is ambiguous does the Court consider parol and extrinsic evidence to provide

clarification.  *Hanks v. Corson County Bd. of County Com'rs*, 727 N.W.2d 296, 301

(S.D. 2007).

> [A] contract is ambiguous only when it is capable of more than one
> meaning when viewed objectively by a reasonably intelligent person who
> has examined the context of the entire integrated agreement and who is
> cognizant of the customs, practices, usages and terminology as generally
> understood in the particular trade or business.

*Ducheneaux v. Miller*, 488 N.W.2d 902, 909 (S.D.1992) (quoting therein 17A Am.

Jur. 2d *Contracts* § 338) (quoted in *LaMore Restaurant Group, LLC v. Akers*, 748

N.W.2d 756, 765 (S.D. 2008)).  Whether the language of a contract is ambiguous is

a question of law.  *LaMore Restaurant Group*, 748 N.W.2d at 765.  If a contract is

ambiguous, it is interpreted and construed against the scrivener, which here is SOD.

*Advanced Recycling Systems, LLC v. Southeast Properties Ltd. Partnership*, 787

N.W.2d 778, 785 (S.D. 2010).

If an express contract does not exist, the doctrine of *quantum meruit* implies

one and awards restitution for the value of the services provided under the implied

contract.  *Johnson v. Larson*, 779 N.W.2d 412, 417 (S.D. 2010); S.D.C.L. § 53-1-3

(distinguishing between express and implied contracts).  In determining whether an

implied contract exists, the Court objectively views the conduct of the parties, their

language, their acts, and other pertinent circumstances attendant to the transaction.

*Cowan v. Mervin Mewes, Inc.*, 546 N.W.2d 104, 108 (S.D. 1996) (quoting therein

*Lien v. McGladrey & Pullen*, 509 N.W.2d 421, 423-24 (S.D. 1993)).  To recover under

*quantum meruit*, the party performing the work must prove the other party requested

it to perform the work and the party performing the work expected reasonable

compensation for that work. *Lindquist Ford, Inc. v. Middleton Motors, Inc.*, 557 F.3d 469, 477-78 (7th Cir. 2009), *cited in Johnson*, 779 N.W.2d at 417-18. The party performing the work may recover even if the work conferred no benefit. *Lindquist Ford*, 557 F.3d at 477-78; *Johnson*, 779 N.W.2d at 417-18.

The doctrine of unjust enrichment is similar but distinct. To recover under this equitable doctrine, the party performing the work must prove there was a benefit conferred upon the other party, the other party acknowledged the benefit, and the other party accepted and retained the benefit "under circumstances such that it would be inequitable to retain the benefit without payment of the value thereof." *Lindquist Ford*, 557 F.3d at 477, *cited in Johnson*, 779 N.W.2d at 418.

In South Dakota, a mechanic's lien on property is created by statute when someone furnishes skill, labor, services, equipment, or materials for the improvement or development of that property, including the grading, filling in, or excavating of the property. S.D.C.L. § 44-9-1(1). An express or implied contract must underpin the lien. *Randall Stanley Architects, Inc. v. All Saints Community Corp.*, 555 N.W.2d 802, 804-05 (S.D. 1996). The mechanic's lien does not substitute for the mechanic's claim but provides security for it. *Lytle v. Morgan*, 270 N.W.2d 359, 361 (S.D. 1978).[13]

The extent of the lien is determined by S.D.C.L. § 44-9-6. It provides:

> If the contribution be made under a contract with the owner

---

[13]On part "2." of the proof of claim form, SOD erroneously referred to its mechanic's lien as the basis for its claim rather than its written and oral agreements with Debtor.

> and for an agreed price, the lien as against him shall be for
> the sum so agreed upon together with the cost of any
> additional material or work agreed upon, otherwise, and in
> all cases as against others than the owner, it shall be for
> the reasonable value of the work done, and of the skill,
> material, and machinery furnished.

Thus, a mechanic's lien is created for the contract price plus the cost of any additional material and work agreed upon. To the extent a contract–written or oral–did not include an agreed price or to the extent the party asserting the mechanic's lien made a contribution other than by contract, that party has the burden under state law to establish the reasonable value of its work or the material or machinery furnished under the second provision of § 44-9-6. *Action Mechanical, Inc. v. Deadwood Historic Preservation Com'n*, 652 N.W.2d 742, 754 (S.D. 2002).

III.

*Burden of Proof*. As discussed above, by application of federal bankruptcy law, SOD is presumed to have met its initial burden of proof upon its filing of a proper proof of claim. 11 U.S.C. § 502(a); Fed.R.Bankr.P. 3001(f); *Be-Mac Transport Co.*, 83 F.3d at 1025-26. Debtor did not challenge the efficacy of SOD's proof of claim, only its accuracy or truthfulness. Accordingly, at trial, Debtor had to come forward with substantial evidence rebutting the initial presumption of the validity and amount of SOD's mechanic's lien. Debtor did so.

As noted above, nothing in SOD's proof of claim or the parties' pre-trial stipulation set forth how SOD's principal claim of $2,114,975.49 had been calculated, tied the four written contracts to particular invoices, or clarified what other express

or implied contracts existed and then tied those express or implied contracts to particular invoices.  It was even unclear whether the 42 invoices attached to SOD's proof of claim were all the invoices SOD had ever submitted to Debtor.  Thus, as the trial opened, there was little in the record supporting SOD's claim as filed.  Resultantly, the evidentiary knoll Debtor needed to level, to return the burden of persuasion to SOD, was low.

Debtor met its burden through the direct examination of Ulmer and the cross-examination of Olson.  Ulmer discussed Debtor's review of all the invoices after its dispute with SOD began in late 2007, and he stated why Debtor believed it could not pay the disputed invoices, including some for lack of contemporaneous documentary support and some for duplication of other invoices.  Olson's testimony, especially on cross-examination, punctuated SOD's failure to clearly detail the services performed in several invoices and to tie each invoice to a particular agreement with Debtor.  That the invoices were difficult to discern from one another underscored Debtor's difficulty in deciphering which invoices to pay.  Both men's testimony, when coupled with SOD's confusing proof of claim and the parties' limited pre-petition stipulation, raised substantial doubt about the disputed invoices.  Accordingly, SOD had to go forward and prove its claim by a preponderance of the evidence.

*Disputed invoices regarding excavation.*[14]  Under invoices 1137a, 1141, 1142, 1189, and 1221, SOD seeks payment for excavating 577,438 cubic yards of clay fill and placing it on Debtor's building site.  These are the most troublesome invoices to

---

[14]This is how both SOD and Debtor categorized these five disputed invoices.

reconcile with the parties' written and oral agreements, each other, and the undisputed invoices.

Much of SOD's evidentiary presentation focused on its theory that the amount of clay it excavated should be calculated based on the number of truck loads SOD hauled from the borrow sites rather than on calculations from before and after surveys of either the borrow pits or the building site or based on the quantity of material for which SOD paid the borrow site owners.  No reliable testimony or other evidence indicated SOD and Debtor ever agreed Debtor would pay SOD for clay fill based on a truck count method.  There was no corroborating documentation for Olson's testimony that this was their agreement.  There was no evidence a truck count method of measuring is common in the industry for a large project like Debtor's.  Also problematic was the fact that written contracts 1 and 3 called for specific amounts of excavation at specific sums, not estimates, though both parties seemed to overlook this contract language.  Further, while all the relevant testimony indicated the building plans were changed a few times to raise the finished elevation, including a significant addition following major flooding in the spring of 2007, little credible evidence established what the terms of SOD and Debtor's agreements were related to the additional excavation, as to either the amount of fill to be provided or the cost. Therefore, based on the entire record presented, the Court may only conclude written contract 2 covered the extra fill placed in late 2006 and early 2007 and that it was modified or supplemented again in the spring of 2007 by executed oral agreements, as required by S.D.C.L. § 53-8-7, to cover the extra fill needed to raise the project

elevation after the major spring flooding.  What remains to be determined is whether SOD's five invoices reflect the parties' modified agreements and whether the compensation sought is reasonable.   Registered land surveyor Randy D. Bacon calculated a total of 309,513 cubic yards of fill were placed on site, based on before and after surveys of the building site.  His figure did not distinguish between the types of fill and may not have accounted for the topsoil that was removed before the fill was placed.

Civil engineer and registered land surveyor Derek McTighe calculated 495,988 cubic yards of compacted fill were placed on site by SOD based on before and after surveys of the building site; he rounded the figure to 500,000.  To this he added a shrinkage factor of 30%, for a total of 650,000 cubic yards that SOD delivered on site (SOD Exhibit 57).  McTighe's calculation assumed substantial topsoil was removed before the clay fill was placed on site by SOD, as reported to him by Olson.  McTighe calculated a similar total using Debtor's proposed truck count method.  His two calculations exceeded the 577,438 total cubic yards set forth in SOD's five invoices.

Civil engineer and registered land surveyor Randall V. Hoscheid calculated, based on surveys of the borrow pits owned by the Young family and Dean Rogers,[15]

---

[15]SOD expended a great deal of time and energy discounting an earlier calculation of fill Hoscheid had made before he had the original pre-excavation survey from Helms & Associates.  Hoscheid freely acknowledged his calculations based on the Helms & Associates survey were more accurate than his earlier calculation, where the original elevations for the "north" and "middle" borrow areas had to be estimated. SOD's repeated challenges to Hoscheid's earlier computation offered little value, except perhaps to show Debtor's own expert's calculations have indicated, since the middle of 2008, Debtor owes SOD for more clay fill.

between 243,031 cubic yards of fill (his calculation) and 264,949 cubic yards of fill (Brosz Engineering's calculation) were removed from the borrow pits and placed on the building site (Debtor Exhibit 19).  To these calculations another 9,606 cubic yards from the John Braun borrow pit and another 46,394 cubic yards from the Young family borrow piles (not the Young family borrow pits) need to be added; both additions reflect figures the parties accepted.[16]  This results in a final tally by Hoscheid of between 299,031 and 320,949 cubic yards of clay fill.

Another available computation was the amount of excavation SOD reported to the borrow pit owners when it paid them.  Based on these figures, SOD excavated 314,429 cubic yards of fill from the Braun, the Young family, and the Rogers properties.[17]  There was no evidence SOD used any other properties to acquire clay fill.

_____

[16]Bacon calculated the 9,606 cubic yards were taken from the John Braun pit. His calculation was not challenged by either party.  The 46,394 cubic yards was extrapolated from Debtor's payments to the Young family for the borrow piles, where SOD and the Youngs had agreed a truck count method would be used to determine what SOD owed the Youngs.  While Olson testified more than 46,394 cubic yards of fill was taken from the Young piles, SOD did not identify anything else in the record to support that statement.

[17]SOD's payments to the borrow site owners are set forth in SOD Exhibit 40. The exhibit shows SOD paid Braun for 26,273 cubic yards of fill at a cost of $15,763.60.  However, during the trial, witnesses for both parties agreed only 9,606 cubic yards were taken from the Braun property (the slightly less figure of 9,598 cubic yards was also occasionally used).  SOD Exhibit 17, which the parties indicated, at the beginning of the trial, SOD intended to offer but never formally did, included a copy of SOD's check to Braun.  The check was dated November 30, 2006 and was for the full $15,763.60.  Adding to the mystery, Debtor accepted SOD's invoice 1243, with its cryptic description "Additional Pay Jon [*sic*] Braun Pit" for $10,000.00.  Robert Breukelman, Debtor's construction manager, was the only person to testify regarding undisputed invoice 1243.  While he indicated the $10,000.00 in invoice 1243 was for

-19-

In its post-trial brief, Debtor argued the figure should be 242,938 cubic yards of clay fill, based on before and after surveys of the building site, a subtraction of materials placed on the site other than clay, and the amount of topsoil removed based on the observations of Debtor's construction manager, Robert Breukelman.  In its brief, Debtor also concedes SOD has a claim for all clay it excavated in excess of 200,000 cubic yards.

In its post-trial brief, SOD argued McTighe's at-trial calculation of 650,000 cubic yards should be accepted.  SOD argued this figure was an accurate reflection of both its own "truck count" method and the "as-built" survey by Helms & Associates.

For three reasons, the Court finds the most reliable figure to be the calculation of yardage based on SOD's actual payments to the Young family and Rogers and the agreed yardage from the Braun pit.[18]  First, while Olson testified SOD had not paid the

---

the 9,606 cubic yards of clay fill taken from the Braun pit, his testimony was nondescript and did not reflect the "Additional" language in the invoice's description. There was no specific discussion by Breukelman regarding whether the agreed 9,606 cubic yards from Braun's borrow pit and Braun's charge per cubic yard to SOD equaled the sum on SOD's invoice 1243.  Further, the January 11, 2008 date on SOD's invoice 1243 does not conform with the November 30, 2006 date on the check SOD wrote to Braun.

If SOD's payment to Braun is calculated based on 9,606 cubic yards, SOD's check to Braun should have been for $5,763.60−exactly $10,000.00 less than what is reflected on SOD Exhibit 40.  Because there has been no explanation in the record for the extra $10,000.00, the Court's calculation reflects only the agreed 9,606 cubic yards from the Braun pit at SOD's agreed price of $5,763.60.  SOD's $10,000.00 payment to Braun on November 30, 2006, and Debtor's apparent agreement to reimburse SOD for it, remains a mystery.

[18]*See supra* note 17.

borrow pit owners in full because Debtor had not paid SOD in full, the present record

does not support that testimony.  Olson never quantified what SOD still owed the

borrow pit owners, and SOD never produced any documents acknowledging it remains

obligated to them.  Olson testified SOD received lien waivers from the Young family

and Rogers.[19]  Most important, SOD did not report in its own bankruptcy case, Bankr.

No. 11-40680 (D.S.D.), that it owed anyone for excavated materials.  SOD will not

be heard advancing a contrary position here.  *See, e.g., E.E.O.C. v. CRST Van*

*Expedited, Inc.,* 679 F.3d 657, 678-80 (8th Cir. 2012) (citing *New Hampshire v.*

*Maine*, 532 U.S. 742, 749-51 (2001)).  The second reason the Court finds this

calculation to be the most reliable of the several offered is the amounts given to the

borrow pit owners were produced by SOD itself and are not impacted by various soil

---

[19]Borrow pit owner Harlan Young testified Olson told him, a few months before the trial, that SOD had more checks for Young and his family apparently back in late 2007 and 2008 but did not give the checks to them then because "things fell apart with Hellwig."  However, during the conversation, Olson did not tell Young the amount of these checks or associate the checks with a particular quantity of unpaid-for fill.  SOD did not produce these particular uncashed checks at trial or provide other documentation of what SOD still owed the borrow pit owners.

Young also testified Debtor paid him and his family another $35,000.00–half of an apparent agreed $70,000.00–in part for fill and in part for an unspecified "contract change."  However, neither SOD nor Debtor elicited testimony from Young or produced an exhibit that established what portion of this side agreement was for actual fill SOD removed from the borrow pits or piles and placed on site.  Young only stated,

> We came to an agreement for $70,000 additional, but a lot of that was really for the contract change. . . .  Some of it was [for dirt], but there was never - - it was never split out completely which was for dirt or which was for contract change.

Thus, the record was insufficient to allow the Court to factor this additional payment into its calculation of total clay fill based on what the borrow pit owners were paid.

density, compaction, or shrinkage factors or the parties' widely divergent figures regarding the amount of topsoil removed.  Third, the 314,429 figure is consistent with other calculations summarized above, excluding McTighe's.  Accordingly, the Court concludes that from disputed invoices 1137a, 1141, 1142, 1189, and 1221, SOD is entitled to payment for 314,429 cubic yards of clay fill; this total includes the 200,000 cubic yards to which Debtor acquiesced in its post-trial brief.

One caveat to the Court's conclusion is neither party's calculations regarding the clay fill were reconciled with the total fill of 365,000 cubic yards set forth in written contracts 1 and 3, which were both signed well before the elevation was raised again in the spring of 2007.  However, when the record is considered as a whole, it appears both Debtor and SOD operated with the understanding the amount of fill in these two contracts included sand, gravel, and other materials–not just clay–and the stated amounts were no longer, if ever, "fixed" but only estimates.  Further, with the exception of invoice 1243 for apparent additional fill from the Braun pit,[20] none of the undisputed invoices clearly reflect clay fill.  Thus, while the record is muddier than the Court would like regarding the relationship of the disputed invoices for clay excavation to written contracts 1 and 3 and the undisputed invoices, the record is what SOD made it, and the 314,429 calculation is the most reliable one produced on the record.[21]

---

[20]*See supra* note 17.

[21]One other troublesome issue for the Court was invoices 1137a, 1189, and 1221 do not appear to have been produced contemporaneous with the services rendered.  Invoice 1137a is dated November 28, 2006, but the "Ship" date is not until

Finally, the record only yielded one figure for the amount Debtor was to pay SOD for the clay fill:  $4.50 per cubic yard.   This figure was reflected in written contracts 1 and 3, and Debtor never seriously challenged the $4.50 as being unreasonable in light of the work actually performed or industry standards.  Thus, the Court concludes Debtor is obligated to pay SOD, under invoices 1137a, 1141, 1142, 1189, and 1221, for 314,429 cubic yards of clay fill at $4.50 per yard for a total cost of $1,414,930.50.

*Disputed invoices 1137b and 1142a regarding stripping of topsoil.*  That SOD removed topsoil from at least the building site and that it is entitled to payment from Debtor for that work is undisputed.  What is disputed is whether the removal of topsoil was covered by written contract 1, how much topsoil was actually removed or should have been removed, and what is the compensation to which SOD is entitled.

---

January 11, 2008.  Invoice 1189 is dated September 18, 2007 and has a "Ship" date of September 18, 2007.  Invoice 1221 is dated December 10, 2007 and has a "Ship" date of December 10, 2007.  Olson testified SOD delayed some invoices because Debtor was not timely paying them.  This testimony was not credible, however, because the record does not support Olson's testimony:  SOD's first invoice in 2007 was dated January 15, 2007 for $231,316.74, and Debtor paid SOD $450,000.00 two days later.  SOD did not generate any more invoices in 2007 until late July 2007, when it gave Debtor eight invoices totaling $413,052.95 for work other than placing clay fill on the building site.  Debtor was, in fact, slow in paying these invoices in full, with $300,000.00 paid to SOD over the next two months, but this happened well after SOD finished bringing in the clay fill.  Moreover, there was no explanation why SOD would send Debtor several invoices in July 2007 for other work and materials but exclude invoices related to the clay fill.  Olson also testified SOD may have sent Debtor some invoices more than once or SOD may have amended some invoices, but he offered no written verification from SOD's or Debtor's records.   The issue is unresolvable on this record, however, because neither party presented any reliable evidence regarding when invoices 1137a, 1189, and 1221 were actually prepared and presented by SOD and actually received by Debtor.

Disputed invoice 1137b is for $74,571.56, including excise tax.  On it, SOD described its work as "Black Dirt stripped -Main Building."  The quantity listed is "29,232" and the "Price Each" or unit price is "2.50."  The invoice is dated December 15, 2006 and has a "Ship" date of December 15, 2006, which would have been contemporaneous with the work performed.  While the "P.O. Number" section is blank, the "Item Code" is "Excavation."  Disputed invoice 1142a  is for $231,316.74, including excise tax.  On it, SOD described its work as "Black dirt stripped- Outside premiter [*sic*]."  The quantity listed is "90,676" and the unit price is "2.50."  The invoice is dated January 15, 2007, and the "Ship" date is also January 15, 2007; the date appears to be somewhat contemporaneous with when the work would have been performed.  While the "P.O. Number" is blank, the "Item Code" is "Excavation."

Based on the language used in written contract 1, the Court concludes removal of topsoil was not covered thereunder.  "Topsoil" is not referenced in the document's ten items of work to be completed.  The contract terms are not ambiguous.  Further, neither party offered any evidence a particular descriptive term used in the contract specifically included or excluded the removal of topsoil based on industry-wide usage of that term.  Debtor's argument that the invoices were not received by Debtor contemporaneous with their dates is well taken, but neither party presented any reliable evidence regarding when SOD presented a particular invoice or when Debtor actually received it.  And it certainly would have made sense that removal of topsoil be in a separate contract that preceded written contract 1 or that removal of topsoil

be a separate line item in written contract 1, as Breukelman testified, but neither happened.   Accordingly, based on the record presented, the Court finds written contract 1 did not include the removal of topsoil.

The record also did not establish the particular terms of an oral contract the parties made for the removal of the topsoil.  The parties' witnesses offered discrepant testimony on who authorized what and when.  The record only showed Debtor and SOD had an understanding SOD would remove topsoil for Debtor in preparation for construction of the packing plant buildings and related work areas and parking lots. Thus, the Court must determine a reasonable compensation for the work performed under *quantum meruit,* as discussed above.

SOD contended it removed an average of two feet of topsoil from the entire work site; Debtor contended only six to seven inches was–or needed to be–removed from the approximately 19 acres where construction actually took place.  Aerial photographs that were offered were skewed by prior flooding, and who took the photos and when were never clearly discussed.  The aerial photographs, as well as the various maps and drawings offered, and the testimony about them never produced a definitive answer concerning what areas were stripped and how deep.

Based on the record before it, the Court finds SOD is entitled to compensation for removing 12 inches of topsoil from 19 acres for a total of 30,653[22] cubic yards. Though SOD may in fact have removed topsoil from a wider area or more deeply, the record does not establish Debtor requested any additional stripping than what was set

---

[22]This number was calculated by civil engineer Kim Stoecker at trial.

forth in Debtor's grading and excavation plans. SOD also did not establish Debtor acknowledged and benefited from any stripping outside the main construction area such as would entitle SOD to compensation under the doctrine of unjust enrichment. Further, the 12 inches fairly reflects Soil Technologies, Inc.'s soil borings and its April 27, 2006 "Soil Exploration Program," wherein it recommended SOD "expose native soils" and remove one to two feet of "topsoil" for the main level footings and, if Debtor were acting conservatively, also for the main level floor slabs or "at least the top 6 inches" for the main level floor slabs if the site were raised four to five feet. The 12 inches and the 19 acres are also consistent with SOD employee Cliff Glanzer's credible testimony that he personally operated a scraper "for about a week" and removed topsoil that "average[d] out to 10 to 12 inches" and later "12 inches or better" "more or less where the building site was." The area is also consistent with the testimony of Debtor's initial surveyor and civil engineer Francis Brink, who said sod was removed from "about 50 feet outside of the building."[23] It is also consistent with Barse's testimony. Barse said the stripping took place at "[t]he main part of the building, part of the parking area, and all of the roadway" and, later, in the stockyards area, though he did not quantify these areas by acre.

As to the cost of removal, Debtor did not challenge the $2.50 per cubic yard set forth by SOD on its invoices as unreasonable or outside the industry norm. The

---

[23]Brink's testimony on cross-examination regarding the stripping "to about 50 feet outside of the building" was more assured than when he stated during earlier cross-examination that it was "a fair assumption" sod was removed from the area within either the silt fence or the "Phase 1 construction limits."

charge is, therefore, accepted by the Court as reasonable, and the claim allowance under invoices 1137b and 1142a is $76,632.50.

*Disputed invoice regarding flooding abatement*.  Disputed invoice 1226 is for $35,714.35, including excise tax.  On it, SOD described its work as "Blade, level, pump water, and keep subcontractors going in out of project."  The date or dates of service are not included.  A "1" was listed in the "Quantity" column, and the unit price is "35,000.00."  The Item Code is "lump sum."  The invoice is dated December 10, 2007 and has a "Ship" date of December 10, 2007.  The "P.O. Number" section is blank.

Based on Barse's testimony and when comparing the date of and the services listed on disputed invoice 1226 to undisputed invoice 1211, the Court finds the services rendered on invoice 1226 are duplicative of those on invoice 1211.  SOD offered no supporting documentation for invoice 1226 but only claimed, through Olson's testimony, these charges related to prolonged rain in October 2007.  Twenty-five dates in October, however, are already covered in invoice 1211.  Accordingly, SOD is allowed nothing under invoice 1226.

*Disputed invoice regarding 2007 mobilization*.  On invoice 1228, SOD described its work as "2007 Spring Mobilization" for $75,000.00, plus excise tax.  The invoice is dated December 10, 2007 and has a "Ship" date of December 10, 2007.  The "P.O. Number" section is blank.

While Olson testified he negotiated this payment with Hellwig when SOD began working again at the plant site in the spring of 2007, Hellwig flatly denied asking SOD

to return to the work site.  Hellwig's testimony was more credible, and Olson had no supporting evidence of an agreement with Debtor for the mobilization reimbursement. Olson also acknowledged SOD first returned to the site only to pump flood water; agreements for SOD to do more earth moving followed thereafter.  Further, the invoice was not generated by SOD contemporaneous with the "work" performed.  Finally, SOD did not establish Debtor benefited from the "work" performed.  Accordingly, SOD's allowed claim will not include payment under invoice 1228 since SOD did not establish an express or implied agreement was made or demonstrate Debtor was unjustly enriched.

*Disputed invoice 1231.*  This invoice is for $3,571.44, including excise tax.  On it, SOD described its work as "Haul rock and sand around project."  The invoice is dated December 10, 2007 and has a "Ship" date of December 10, 2007.  The "P.O. Number" section is blank.  The dates of service are not set forth on the invoice.

Olson testified he talked to Hellwig about this work.  He did not state the dates the work was done or state what consideration was agreed to; he only testified at trial that, "[w]e hauled rock around to the other part, the other side of the basement, and other places on the -- on the site, or if it was muddy or if they needed it by the basement or something."  His testimony during an earlier deposition was more limited; at that time he could not remember what he and Hellwig had discussed, and he stated the $4.25 per cubic yard charge may have just been what he thought the work was worth.

Without more reliable evidence, the Court cannot conclude an express or implied

contract was reached.  Moreover, SOD did not demonstrate Debtor was unjustly enriched.  Accordingly, SOD's allowed claim will not include payment for invoice 1231.

*Disputed invoices regarding black dirt*.  Disputed invoice 1232 is for $14,285.74, including excise tax.  On it, SOD described its work as "Blade Black dirt in front of project site."  The invoice is dated December 10, 2007 and has a "Ship" date of December 10, 2007.  The "P.O. Number" section is blank.

Hellwig initially testified Debtor accepted this invoice.  Other witnesses, in particular Barse and Breukelman, pointed out the work itemized on invoice 1232 was already covered by undisputed invoice 1175.  Barse testified the deal he had negotiated between SOD and Debtor encompassed both moving a pile of black dirt, putting it "north of the parking lot" in the lower area, and leveling it out for $2.50 per cubic yard, which is reflected on invoice 1175.  His testimony was more definitive and credible than Olson's testimony about making a deal with Hellwig for the work in front of Debtor's lot that is reflected in invoice 1232.  Accordingly, payment for invoice 1232 is not included in SOD's allowed claim.

Disputed invoice 1235 is for $10,612.26, including excise tax.  On it, SOD described its work as "2,500 Cu. yds. Black Dirt put on site."  The quantity is listed as "2,500" and the unit price is listed as "4.00."  The invoice is dated December 11, 2007 and has a "Ship" date of December 11, 2007, but when the service was performed is not stated.  The "P.O. Number" section is blank.  The "Item Code" is "Dirt."

The record on invoice 1235 was very limited.  Hellwig and Barse testified they were not aware of the work listed on this invoice.  Breukelman testified that $4.00 per cubic yard to move black dirt from one place to another and level it was not a reasonable charge.  He too did not have a specific recollection of the invoice or any agreement with SOD to do this work.  Ulmer testified he did not authorize the payment of this invoice on Debtor's behalf because there was "nothing here that justifies that payment."  Olson testified the black dirt referenced in invoice 1235 was "put on behind the curve around where Red [Wilk, the road builder] worked."  Olson said he made the deal for it with Hellwig.

For three reasons, SOD's allowed claim will not include payment of invoice 1235.  First, as noted by Ulmer, the invoice did not include adequate information to assess what work was done when.  Second, SOD did not establish it had an oral agreement with Debtor for this work.   Third, as acknowledged by Olson, the placement of this black dirt was related to Wilk's road work, and the Court is unable to distinguish it from work on invoice 1227, which is being allowed in full.

*Disputed invoice regarding the screening of sand*.   Invoice 1233 is for $87,857.30, including excise tax.  On it, SOD described its work as "41,000 tons of screening sand."  The invoice is dated December 10, 2007 and has a "Ship" date of December 10, 2007.  The "P.O. Number" section is blank, and the Item Code is "Misc."  The quantity listed is "41,000" and the unit price listed is "2.10."  The date the work was performed is not listed.

Barse credibly testified he negotiated, between Olson and Breukelman, for SOD

-30-

to screen the sand for $1.00 per ton.  While Olson cursorily testified he negotiated a higher rate with Hellwig, he had no supporting documentation to aid his self-serving testimony.  Accordingly, the Court finds SOD is entitled to payment of $41,000.00 under invoice 1233 for screening sand.

*Disputed invoice 1234.*  This invoice is for $179,935.78, including excise tax.  On it, SOD described two claims.  The first was for "Cu. yrd. Dirt- Place, level and pack out of rendering" for $37,825.00.  SOD listed this quantity as "8,900" and the unit price as "4.25."  The second was for "Cu. yrd. Dirt-Place, level and pack out of basement" for $138,511.75.  SOD listed this quantity as "32,591" and the unit price as "4.25."  The "Item Code" for each claim was "Dirt."  The invoice is dated December 10, 2007 and has a "Ship" date of December 10, 2007.  The "P.O. Number" is blank.  The date or dates these services were performed are not on the invoice.

As testified to by Barse, invoice 1234 is duplicative of undisputed invoices 1176 and 1177.  Olson said they represented separate work.  Barse's testimony was more credible, especially where SOD had no supportive evidence for Olson's testimony and where SOD did not establish the December 2007 date on invoice 1234 was somewhat contemporaneous with when the particular services would have been performed by SOD.  Accordingly, SOD's allowed claim will not include payment for invoice 1234.

*Disputed invoice regarding excise tax*.  SOD produced an unnumbered invoice to get reimbursed for some excise tax that it paid the state but that Debtor owed (SOD

Exhibit 32).[24]  The amount of the claim is $44,942.39.  As acknowledged by SOD, Debtor already paid it $44,942.39 on February 21, 2007.  Accordingly, SOD is not entitled to increase its claim by that amount, even if the unnumbered invoice is denominated "unpaid" on its internal records.

*Total allowed claim*.  The undisputed invoices identified by the parties before trial totaled $1,718,380.23.  Debtor conceded post-trial to the inclusion of $32,653.12 from previously disputed invoice 1227, resulting in an undisputed total of $1,751,033.35.  Based on this decision, that sum is increased by $1,532,563.00, plus a 2.041% excise tax of $31,279.61,[25] for a total of $3,314,875.96.  After Debtor's payments of $3,109,771.89 are subtracted, the Court finds Debtor owed SOD $205,104.07 on the petition date, plus pre-petition statutory interest, which the parties may confer and calculate.

The Court further concludes SOD's claim remains secured by its pre-petition mechanic's lien.  The record was insufficient for the Court to find SOD intentionally and willfully filed a false or exaggerated claim.  *See R & L Supply, Ltd. v. Evangelical Lutheran Good Samaritan Society*, 462 N.W.2d 515, 518-19 (S.D. 1990).  The record only shows Debtor and SOD's loose working agreements, Debtor's indistinct chain of

---

[24]The Court was unable to find SOD's claim for reimbursement of the excise tax in its proof of claim.

[25]Five of the eight invoices that are allowed, in whole or in part, under this decision included a 2.041% excise tax.  Only two included sales tax.  Because no meaningful record was made regarding the applicable taxes on the disputed invoices, the Court has included the excise tax in its allowance based on the majority of the invoices.

command, and Debtor's changing construction requirements resulted in less than ideal bookkeeping on both sides.

IV.

As part of its proof of claim and as argued in its closing brief in this adversary proceeding, SOD wants pre-petition attorney fees under S.D.C.L. § 44-9-42 and post-petition costs on its fully secured claim under 11 U.S.C. § 506(b).[26]  SOD, however, did not quantify and itemize its request under § 44-9-42 or § 506(b) in its proof of claim or present an itemized request until trial.  Consequently, Debtor and other parties in interest have not had an opportunity to consider them and respond with any appropriate objections.

So the matter may be fully and fairly presented, SOD may, in Debtor's main bankruptcy case, file and give notice of an application for its request for attorney fees under § 44-9-42 and, separately but in the same application, its request for post-petition costs under § 506(b).  *See* Bankr. D.S.D. R. 2016-3.  The Court will cross-docket the application on the claims register as a supplement to SOD's proof of claim and resolve any timely filed objections.  Any allowances under the application will be added to SOD's allowed secured claim of $205,104.07 plus the pre-petition statutory interest the parties will calculate.

In a chapter 11 case a § 506(b) allowance is generally calculated to the effective date of a plan.  *See, e.g.*, 11 U.S.C. §§ 506(b) and 1129(b)(2)(A)(I) and *In*

---

[26]The Court was unable to find where SOD referenced 11 U.S.C. § 506(b) in its proof of claim in Bankr. No. 13-10118 or in its counterclaim or cross-claim in this adversary proceeding.

-33-

*re DeQueen General Hosp.*, 418 B.R. 289, 295-96 (Bankr. W.D. Ark. 2009). However, there will be no plan in this case, and the Court has heard loud whispers Debtor may soon seek voluntarily conversion to chapter 7. Thus, unless SOD can establish law in this circuit to the contrary, SOD's request under § 506(b) should be calculated to the date of the trial on its claim in this adversary proceeding.

V.

SOD and Debtor shall confer to calculate pre-petition statutory interest on SOD's allowed principal claim of $205,104.07. After SOD has filed and given notice of an application as discussed above, the Court will consider SOD's entitlement to pre-petition attorney fees under S.D.C.L. § 44-9-42 and post-petition costs, including post-petition interest and attorney fees, under 11 U.S.C. § 506(b). Once those figures are known, an order will be entered establishing the amount of SOD's secured claim. The order will then be reflected in the adversary proceeding's final judgment.

Dated: September 22, 2014.

BY THE COURT:

Charles L. Nail, Jr.
Bankruptcy Judge

NOTICE OF ENTRY
Under Fed.R.Bankr.P. 9022(a)

This order/judgment was entered
on the date shown above.

Frederick M. Entwistle
Clerk, U.S. Bankruptcy Court
District of South Dakota